IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROMANUS MILES | : | CIVIL ACTION |
| | : | NO. 94-4669 |
| v. | : | |
| | : | |
| ALFRED ELLIOT et al. | : | |
| | : | |

O'NEILL, J.                                                                                                  October 13, 2011

## MEMORANDUM

Plaintiff Romanus Miles filed the instant action on August 9, 1994. He claims that the individual defendants used excessive force when they arrested him in violation of his rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the Constitution of the United States. Plaintiff also claims that defendants are liable for assault and battery under Pennsylvania law. Defendants Retired Police Officer Alfred Elliott and Police Officer Christopher Lewis now move for summary judgment in their favor on all claims.[1] For the reasons that follow, I will grant in part and deny in part defendants' motion.

## BACKGROUND

On July 12, 1993, a jury convicted plaintiff of aggravated assault on Officers Lewis and Elliott and of carrying a firearm on a public street. <u>Commonwealth v. Monte Miles</u>, November Term, 1992, No. 2225 3/3 (Pa. Ct. Comm. Pl. Phila. Cnty.); <u>see also</u> Defs.' Ex. A. Plaintiff's conviction and his claims in this action stem from events occurring at the corner of Castor and Adams Avenues in Philadelphia, Pennsylvania at about 1:00 a.m. on September 1, 1992.[2] The

---

[1] The parties have stipulated to the dismissal with prejudice of all claims in this action against defendants City of Philadelphia and Tyrone Randall.

[2] Plaintiff's case was in suspense for almost fourteen years while he exhausted his appeals of his felony conviction.

parties offer conflicting details in their accounts of the night's events.

## I.  Defendants' Account

Defendants contend that on the evening in question defendant Lewis and his partner Officer Tyrone Randall, in an unmarked vehicle and in plainclothes, were assigned to conduct surveillance of a bar for a possible robbery suspect because of a series of bar holdups in the northeast part of Philadelphia. Defs.' Ex. C at 7:24-8:15, 10:3-6; Defs.' Ex. D at 7:12-24. While on assignment they noticed a male approaching the bar who fit the description of a suspect who had robbed another bar in the surrounding area. Defs.' Ex. C at 8:16-24. While they sat in their vehicle, a male later identified as plaintiff walked towards the bar, looked in, walked away and returned with a second male carrying a red motorcycle helmet, later identified as James McNeill. Defs.' Ex. C at 10:3-18. The men appeared to argue between themselves and walked away from the bar. Defs.' Ex. C at 10:22-24. Officers Lewis and Randall decided to stop plaintiff and McNeill. Defs.' Ex. C at 10:3-18.

Randall communicated over police radio the details of their surveillance of plaintiff and McNeill and requested that backup respond without lights and sirens. Defs.' Ex. D. at 16:1-5. Randall drove to the corner of Castor and Adams, where plaintiff and McNeill had stopped walking. Defs.' Ex. D at 19:22-20:13, 22:12-23:4. Randall and Lewis exited the unmarked car with their police badges around their necks and identified themselves as Philadelphia police officers. Defs.' Ex. C at 15:3-16:5; Defs.' Ex. D at 23:1-12, 24:12-21. Randall yelled to plaintiff and McNeill, "Put your hands up! Police!" Defs.' Ex. D at 24:22-25:20. Lewis told plaintiff and McNeill to put their hands up where he could see them. Defs.' Ex. C at 16:6-9. Plaintiff responded by running away, westbound on Adams Avenue. Id. at 17:13-20. Lewis ran after

plaintiff.  Id. at 18:1-24.

Both plaintiff and Lewis then slowed from a run to a walk.  Id. at 20:14-21, 23:1-24:13.  Plaintiff had his back to Lewis, but looked over his shoulder in Lewis' direction and began to walk into the street.  Id. at 24:14-16, 25:11-21.  Lewis continued to yell "Police!" and gave a description of plaintiff over police radio.  Id at 24:12-13, 26:10-22.  He then observed plaintiff "fumbling" as if he was going to take something out of his clothing.  Id. at 21:1-28:8.  He saw that plaintiff had removed an object from his clothes and, when plaintiff put the object behind his back, Lewis realized it was a gun.  Id. at 39:5-16.  He heard a sound that he believed to be a shot and saw a flash.  Id. at 39:17-22.  Lewis thought plaintiff had aimed the gun at him when he saw plaintiff fire the gun from behind his back, looking over his shoulder.  Id. at 40:13-23.  Lewis then took cover behind a vehicle and heard a series of three or four shots.  Id. at 43:2-10, 44:11-46:3, 48:9-17.

The shots Lewis heard were four shots fired by defendant Elliott.  Defs.' Ex. B at 34:10-12.  Elliott and his partner Officer Jose Cruz were assigned to the stakeout unit of the Philadelphia Police Department, each wearing a Philadelphia police uniform and traveling in a marked police wagon.  Id. at 7:23-8:2, 10:22-11:21.  Elliott and Cruz responded as backup to a police radio call of two persons fitting the description of robbery suspects under surveillance near the intersection of Castor and Adams Avenues.  Id. at 9:8-24, 10:12-16.  Elliott understood that the suspects were going to be stopped for an investigation.  Id. at 9:14-24.  He drove the marked police wagon on Adams Avenue towards Castor Avenue.  Id. at 10:12-16.  As he drove, he saw plaintiff walking in the opposite direction on Adams to the left of the wagon.  Id. at 12:3-16, 13:9-18.  Elliott stopped the vehicle, exited through the driver side door and began walking

towards plaintiff.  Id. at 13:19-24, 14:7-13.

According to Elliott, plaintiff turned and looked at Elliott over his shoulder and "fumbled in front of his sweater." Id. at 14:14-15, 21:13-20.  Plaintiff then "brought his right arm around behind him with an object and as he put it around . . . his back [Elliott] saw that it was a shotgun . . . ." Id. at 14:18-20.  Plaintiff fired the gun at Elliott, who was twenty or twenty-five feet away from him.  Id. at 14:21-24; 22:2-15.  Elliott responded by drawing his weapon and firing a shot at plaintiff.  Id. at 22:21-24; 23:6-7.  Elliott's first shot struck the rear of a vehicle. Id. at 27:2-5.  Plaintiff ran away from Elliott, varying his course in an effort to throw off Elliott. Id. at 27:13-22, 28:1-4.  While trying to evade Elliott, plaintiff "had the shotgun back up again as if to shoot." Id. at 28:10-11; see also id. at 28:22-23 ("[H]e still was trying to shoot with the shotgun.").  Less than five seconds after firing his first shot, Elliott fired a second shot at plaintiff.  Id. at 29:10-30:23.  Plaintiff kept running.  Id. at 35:6-11.  Less than five seconds later, Elliott fired a third shot at plaintiff.  Id. at 36:20-37:18.  Not knowing whether his second or third shots had struck plaintiff, id. at 38:11-39:2, Elliott fired a fourth shot at plaintiff as he continued to pursue plaintiff further up the street.  Id. at 44:20-45:3.  Plaintiff then fell to the ground and shouted "I am shot!  I am shot!" Id. at 48:18-19.  Elliott stopped firing.  Id. at 48:20.

Elliott testified that after he stopped firing, Lewis ran past him towards plaintiff.  Id. 61:23-62:17.  Lewis testified that after he heard the shots, he looked from behind the vehicle where he had taken cover and saw plaintiff falling to the ground.  Defs.' Ex. C at 48:9-50:2.  He dropped his police radio and ran to plaintiff, jumping on him, grabbing his arms to pull them behind plaintiff and then handcuffed plaintiff.  Id. at 56:3-65:18.  Lewis testified that the only other physical contact he had with plaintiff after he handcuffed him was to place plaintiff on his

side because he had been shot. Id. at 65:19-67:7, 69:1-17. Lewis testified that he did not strike or kick plaintiff and that he did not know if anyone else struck or kicked plaintiff. Id at 70:7-15. Elliott likewise testified that he had no physical contact with plaintiff after plaintiff fell to the ground. Defs.' Ex. B at 64:4-7.

## II.     Plaintiff's Account

In his response to defendant's motion for summary judgment, plaintiff does not dispute defendants' assertion that he possessed and fired a weapon on September 1, 1992. Nor does he dispute defendants' account of the events that led to their pursuit of plaintiff on that night. However, plaintiff's testimony includes significant differences from defendants' testimony with respect to: (1) the timing of Elliott's final shot and (2) plaintiff's treatment after he was handcuffed.

According to plaintiff, Elliott jumped out of his vehicle and, without identifying himself as a police officer, ordered plaintiff to halt. Defs.' Ex. E at 72:22-74:5. Elliott then shot plaintiff at least once in his leg and back and plaintiff fell to the ground. Pl.'s Ex. C at 2. Plaintiff contends that <u>after</u> he was on the ground, Elliott shot him again. Pl.'s Ex. E at 78:19-79::-6. He testified that he "hollered twice that I had been shot, then I heard a faint voice, something to the effect of so what. I heard it this time, and then I felt the third bullet, which I didn't know it was a third bullet at the time. . . . I felt a real sharp pain hit me in my buttocks." Id. at 78:23-79:6. At his deposition, plaintiff estimated that the final shot was fired five to ten seconds after the third bullet hit him. Id. at 81:1-82:1.

Plaintiff contends that after Elliott stopped shooting, he lay on the ground, unarmed, appearing to be in pain and did not attempt to flee or resist arrest. Pl.'s Ex. D. at 20:6-7.

Contrary to the testimony offered by defendants, plaintiff testified that after Lewis handcuffed him, police officers began to kick and hit him:

> A. From there, I felt people start to kick me and hit me.
>
> Q. How many people were kicking and hitting you?
>
> A. I can't estimate that.
>
> Q. Did you see any people kicking or hitting you?
>
> A. No, sir.
>
> Q. Why not?
>
> A. When you're on the ground getting beat, you don't look up in between the kicks and punches to see who is doing what.

Pl.'s Ex. E at 83:2-13. Plaintiff's testimony does not identify the officers responsible for kicking and hitting him, but he contends that Lewis was close enough to him at the time of the beating that he could have participated in the beating. Pl.'s Ex. F at 33:18-22 (Lewis was "close enough to touch Plaintiff" for "approximately, maybe 20 minutes" after the shooting.).

## STANDARD OF REVIEW

The party moving for summary judgment has the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under

governing law. Id. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## DISCUSSION

### I.      Count I: Denial of Constitutional Rights

Defendants argue that plaintiff's section 1983 claims cannot proceed because the record on summary judgment establishes that they are entitled to qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity "seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability by attaching liability only if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right." United States v. Lanier, 520 U.S. 259, 270-71 (1997) (internal citations and quotations omitted).

Qualified immunity claims are typically resolved "under a two step test, deciding (1) whether facts alleged or shown make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's misconduct." Manigault v. King, 339 F. App'x 229, 230 (3d Cir. 2009), citing Saucier v. Katz, 533 U.S. 194, 201 (2001). "[W]hen making these objective determinations at the summary judgment stage, the Court still takes as true Plaintiff's well supported allegations." Rab v. Borough of Laurel Springs, No. 08-2413, 2009 WL 517 4641, at *4 (D.N.J. Dec. 18, 2009), citing Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009). "It is inappropriate to grant summary judgment if there are material factual disputes as to whether a constitutional violation has occurred or whether the constitutional right is clearly established." McNeil v. City of Easton, 694 F. Supp. 2d 375, 387 (E.D. Pa. 2010) (citations omitted). "The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). I will first consider whether plaintiff has set forth sufficient evidence of a violation of his constitutional rights to withstand defendants' motion.

A.      Shooting

In determining whether Elliott violated plaintiff's Fourth Amendment rights when he shot plaintiff, I must consider whether Elliott's conduct was objectively reasonable. See Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007) ("In an excessive force case, whether there is a constitutional violation is properly analyzed under the Fourth Amendment's objective reasonableness standard . . . .") (internal quotation marks omitted); see also Bloxson v. Borough of Wilkinsburg, 110 F. App'x 279, 282 (3d Cir. 2004) ("Excessive force allegations are properly scrutinized under a Fourth Amendment objective reasonableness standard."). "The relevant inquiry is 'the reasonableness of the officer's belief as to the appropriate level of force[,]' which 'should be judged from [the officer's] on-scene perspective,' and not in the '20/20 vision of hindsight.'" Curley, 499 F.3d at 206, quoting Saucier, 533 U.S. at 205. The reasonableness of Elliott's actions must be analyzed in light of the totality of the circumstances and the analysis requires "careful attention to the facts and circumstances of [plaintiff's] case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989), quoted in Curley, 499 F.3d at 207.

Defendants argue that Elliott's conduct was objectively reasonable because he believed that plaintiff posed a threat of serious physical harm to him when plaintiff fled and fired a weapon at Elliott. See Tennessee v. Garner, 471 U.S. 1, 11-12 (1985) ("Where officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force."). Plaintiff contends, however, that at least one of Elliott's shots was fired after plaintiff

fell to the ground and because plaintiff no longer posed a conceivable threat, Elliott's conduct was unreasonable.  See Lamont ex rel. Estate of Quick v. New Jersey, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."); see also Sullivan v. Warminster Twp., 765 F. Supp. 2d 687, 700-01 (E.D. Pa. 2011) (denying summary judgment because a genuine issue of material fact existed as to whether it was reasonable for defendant officers to continue to fire at the back of a fleeing suspect after he had dropped his weapon).

      Given the parties' divergent accounts of the timing of the shots fired by Elliott and plaintiff's conduct when the last shot was fired, I find that genuine issues of material fact remain. Those issues of material fact preclude me from finding that Elliott is entitled to qualified immunity at this stage in the proceedings.  See Wilhere v. Del. Cnty., No. 09-22, 2010 WL 1381664, at *7 (E.D. Pa. Apr. 1, 2010) (denying without prejudice the defendant's motion for summary judgment on the basis of qualified immunity on the grounds that there existed genuine issues of material fact as to the circumstances surrounding the plaintiff's arrest).  In order to determine whether Elliott is entitled to qualified immunity, a jury must first make findings of fact at trial as to the timing of Elliott's final shot and plaintiff's conduct at the time that the final shot was fired.  See Curley, 298 F.3d at 278 ("Thus, while we have recognized that it is for the court to decide whether an officer's conduct violated a clearly established constitutional right, we have also acknowledged that the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue."); Wilhere, 2010 WL 1381664, at * 7 ("[T]he defendants may raise a qualified immunity defense after the disputed

issues of fact are resolved."). "[T]he ultimate decision as to whether [Elliott] is entitled to qualified immunity is a matter of law that will be decided by the Court." Mitchell v. City of Phila., No. 09-4459, 2011 WL 1448123, at *4 (E.D. Pa. Mar. 29, 2011), citing Curley, 499 F.3d at 211 ("We therefore take the opportunity to reiterate and clarify a central message from [Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004)]: whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury."); Morrison v. Phillips, No. 06-812, 2008 WL 4308215, at *10-11 (D.N.J. Sep. 16, 2008) (finding a genuine issue of fact as to whether arresting officers employed excessive force and that "once the jury resolves [the factual questions regarding the constitutional violation], the Court will be in a position to determine whether [the defendants] made a reasonable mistake of law and are entitled to qualified immunity").

     **B.    Alleged Kicking and Hitting**

There is no testimony from Lewis, Elliott, Randall or any witness other than plaintiff that plaintiff was kicked or beaten after Lewis placed him in handcuffs. Plaintiff's own testimony does not identify the officer or officers alleged to have kicked or hit him as he lay on the ground. Even if plaintiff could establish that his constitutional rights were violated when he was allegedly kicked and beaten after he was handcuffed, his claim cannot withstand summary judgment because he has not presented any evidence as to the identity of the officers who allegedly kicked or beat him.

In Sharrar v. Felsing, 128 F.3d 810, 821 (3d Cir. 1997), abrogated on other grounds as recognized in Curley, 499 F.3d at 209, where the plaintiff could not identify the police officers responsible for his alleged abuse, the Court of Appeals found that "[t]here was . . . no evidentiary

basis on which to hold . . . defendants liable" and affirmed the District Court's grant of summary judgment for the defendants on the plaintiff's excessive force claim. Likewise, in Taylor v. Brockenbrough, No. 98-6419, 2001 WL 1632146, at *2 (E.D. Pa. Dec. 20, 2001), the Court granted the defendant's motion for summary judgment on the plaintiff's excessive force claim as there was "no evidence upon which to hold any of the defendants liable for the alleged violation of [the plaintiff's] rights" where neither the plaintiff nor any witness was "able to identify the exact police officer responsible for [the plaintiff's] alleged beating." See also McNeil, 694 F. Supp. 2d at 399 ("I am constrained to grant defendants' motion for summary judgment because plaintiff has not provided any evidence as to which officer kicked him in the head.") (emphasis in original); cf. Howell v. Cataldi, 464 F.2d 272, 282 (3d Cir. 1972) ("Mere presence of a person, when an assault and battery is committed by another, even though he mentally approves of it, but without encouragement of it by word or sign, is not sufficient itself to charge him as a participator in the assault.").

Because there is no record evidence that Lewis or Elliott kicked or beat plaintiff, plaintiff has not met his "initial burden of showing that [Lewis's or Elliott's] conduct [after plaintiff was handcuffed] violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). Accordingly, I will grant defendants' motion for summary judgment with respect to plaintiff's claims that defendants used excessive force against him after he was placed in handcuffs.

## II.     Count III: Intentional Tort Claim

Defendants argue that the state law claims against them are barred by the Political Subdivision Tort Claims Act, 42 Pa. Const. Stat. § 8541 et seq. The Tort Claims Act provides

"that a government official may only be held liable for conduct that 'constitute[s] a crime, actual fraud, actual malice or wilful misconduct.'" Jones v. City of Phila., No. 08–3336, 2011 WL 710212, at *5 (E.D. Pa. Feb. 25, 2011), quoting 42 Pa. Cons. Stat. §§ 8542, 8550.  In most cases, the term "willful misconduct" is synonymous with the term "intentional tort." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa.1994), citing King v. Breach, 540 A.2d 976, 981 (Pa. Commw. Ct. 1988).  In a case that alleges police misconduct, however, "to rise to the level of willful misconduct, a police officer must intend to commit the intentional tort." See Brummell v. City of Harrisburg, No. 09–1816, 2010 WL 3896382, at *3 (M.D. Pa. Sept. 30, 2010) (emphasis in original), citing Pettit v. Namie, 931 A.2d 790, 801 (Pa. Commw. Ct. 2007).  "A police officer may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive." Renk, 641 A.2d at 293.

     I find that there remains a genuine issue of material fact as to whether Elliott used more force than necessary when fired his final shot at plaintiff.  Viewing the facts in the light most favorable to plaintiff, as I must, I find that a reasonable jury could conclude that Elliott committed willful misconduct.  If plaintiff's version of events is true, Elliott would have known that his of force against plaintiff was excessive.  I will deny defendants' motion for summary judgment insofar as it contends that Elliott is entitled to immunity under the Tort Claims Act.

     Plaintiff has not offered any facts to create a genuine issue for trial that Lewis committed the intentional torts of assault and battery.  Therefore I will grant summary judgment to Lewis on this claim.